B. John Casey, OSB # 120025
Email: john.casey@klgates.com
Stephanie McCleery, OSB # 115834
Email: stephanie.mccleery@klgates.com
K&L GATES LLP
One SW Columbia Street, Suite 1900
Portland, OR  97258
Phone: (503) 228-3200 / Fax: (503) 248-9085

Michael J. Abernathy (*pro hac vice pending*)
Email:  michael.abernathy@klgates.com
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, IL 60602
Phone: (312) 372-1121 / Fax: (312) 827-8000

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON (PORTLAND DIVISION)

| | |
|---|---|
| CARBON AUDIO, LLC, a Delaware limited liability company, and HEADBOX, LLC, d/b/a BOOMPHONES, a Delaware limited liability company,<br><br>                                    Plaintiffs,<br><br>         v.<br><br>MONSTER, INC., a California corporation,<br><br>                                    Defendant. | Case No.<br><br>**COMPLAINT FOR TRADE DRESS INFRINGEMENT, UNFAIR COMPETITION, TRADE SECRET MISAPPROPRIATION, TORTIOUS INTERFERENCE, STATE UNFAIR BUSINESS PRACTICES, CIVIL CONSPIRACY, CONVERSION AND UNJUST ENRICHMENT**<br><br>**JURY TRIAL DEMANDED** |

K&L GATES LLP
222 SW COLUMBIA STREET
SUITE 1400
PORTLAND, OR  97201-6632
TELEPHONE: (503) 228-3200

Plaintiffs Carbon Audio, LLC ("Carbon Audio" or "Carbon") and Headbox, LLC, d/b/a Boomphones ("Boomphones" and, collectively, "Plaintiffs") bring this action against Defendant Monster, Inc. ("Monster"), to obtain temporary, preliminary and permanent injunctive relief, actual and treble damages, punitive damages, attorneys' fees, and costs for Monster's wrongful acts as described below.

## NATURE OF ACTION

1.      Monster has willfully (a) misappropriated Plaintiffs' valuable trade secrets, and (b) infringed Plaintiffs' intellectual property.  Monster plans to introduce to the U.S. market at an indeterminate time in March 2014 a portable Bluetooth speaker device called the "Superstar."  The Superstar is a complete knock-off of Plaintiffs' "Pocket Speaker" product.  Minus a Monster logo, the Monster product looks and feels exactly the same as the Pocket Speaker.  Monster, in fact, went as far as copying the distinctive and proprietary sounds (*e.g.*, "on" "connected" "full battery") of Plaintiffs' product.  Below are side-by-side comparisons of the products:

| PLAINTIFFS' PRODUCT | DEFENDANT'S PRODUCT |



K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

2.      This was not by accident.  To manufacture its Superstar product, Monster tapped the same Chinese company, Shenzhen 3NOD Electronics Company, Ltd. ("3NOD"), that manufactures Plaintiffs' Pocket Speaker.  3NOD uses valuable trade secrets owned by Plaintiffs – including firmware, tooling, internal specifications, and user interface – to manufacture the Pocket Speaker and is required, by agreement, to keep those trade secrets confidential.  Monster knew or, at the very least, had reason to know of these facts.  By using 3NOD to make a virtually identical product – with the same internal configuration, the same external configuration, the same firmware, and the same tones to designate particular operations – in breach of 3NOD's confidentiality obligations, Monster has both misappropriated Plaintiffs' trade secrets and tortiously interfered with Plaintiffs' business relations and/or prospective economic advantage.

3.      Further casting a shadow on Monster, Plaintiffs have received information that Monster had wrongfully obtained from 3NOD a prototype of the Pocket Speaker – before the product was even out on the market.  Plaintiffs were further informed that Monster had placed a Monster logo on the prototype and was promoting it as a forthcoming "Monster" product in Europe.  3NOD originally denied providing a prototype to Monster.  Recently, however, 3NOD acknowledged that, in violation of its contractual confidentiality obligations, it provided a prototype of the Pocket Speaker to another consumer audio products company called SOL Republic.  SOL Republic is closely connected with Monster – its founder and CEO, Kevin Lee, is also Vice President of Corporate Strategy of Monster and just so happens to be the son of Monster's founder and CEO, Noel Lee.

4.      In addition to misappropriating Plaintiffs' trade secrets, Monster's Superstar product infringes the Pocket Speaker's trade dress.  3NOD did not think it was possible to produce a product like the Pocket Speaker.  Pocket Speaker inventor Jason Riggs spent months in China with 3NOD working on the product.  The result was a product that was very different than any previous Bluetooth speaker.  With its portable "pocket" size, its distinctive rectangular

PAGE 3 – COMPLAINT

shape with four evenly rounded corners, its perforated grille, its circle-design passive radiator in the center of the grille, as well as its powerful and high quality sound, the Pocket Speaker stood alone in the market. Since its introduction to the market in November 2013 (at Apple stores), Plaintiffs have aggressively marketed the Pocket Speaker, sales have been strong, and the product has enjoyed positive press. Consumers now identify the design of the product with Plaintiffs, and Monster's knock-off has caused, and will continue to cause, confusion in the market.

5.      Noel Lee, Monster's founder and longtime CEO, was quoted a few years ago as follows:

Q:              The both of you [Noel Lee of Monster and his son, Kevin Lee of SOL Republic] have products that are prized as unique and stylish. Touch on the innovative aspects and hardships of building a product from the ground up.

Noel Lee:       Nobody ever saw headphones as fashion. So we pioneered the concept that it can be fashionable. **If you can't do it differently or better, there's no sense in doing it. There are leaders and there are followers. And some of the followers are copiers: counterfeit. So there's hundreds of people out there, thousands doing that. If I make a headphone, I just go to China and there are a thousand manufacturers. It's easy to pick one from the crowd and say, "you know what, modify the color on this one," and that'll be my headphone. And there are hundreds of companies that go out there and do that. Doing a headphone from scratch and being innovative, doing something that no one else has ever done, both in sound and innovation, is really hard.**[1]

6.      Mr. Lee has failed to heed his own advice. Indeed, with its knock-off "Superstar" product, Monster is doing precisely what Mr. Lee denounced just a few years ago. Instead of being a "leader," Monster instead has become a "follower" and a "copier." Specifically, Monster has misappropriated Plaintiffs' trade secrets and slavishly copied Plaintiffs' innovative product.

---

[1]      http://www.complexmag.ca/tech/2011/12/interview-monster-cable-noel-lee-sol-republic-kevin-lee/page/2

PAGE 4 – COMPLAINT

7.      Plaintiffs' wrongful and predatory conduct has caused, and will continue to cause, Plaintiffs to suffer irreparable harm.  Indeed, for small, start-up companies like Plaintiffs, this type of conduct is enterprise threatening.

8.      Monster's actions must be put to a stop.

## THE PARTIES

9.      Plaintiff Carbon Audio is a Delaware LLC with its principal place of business in Portland, Oregon.

10.      Plaintiff Boomphones is a Delaware LLC with its principal place of business in Los Angeles, California.

11.      Defendant Monster, Inc. is a California company with its principal place of business in Brisbane, California and, on information belief, previously did business as Monster Cable Products, Inc.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction under one or more of the following statutes:  28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1338 (federal trade dress and unfair competition) and 28 U.S.C. § 1367 (supplemental jurisdiction).

13.      This Court has personal jurisdiction over Monster because (a) its products are marketed and sold in this District, (b) it has marketed and is preparing to sell its Superstar product in this District, (c) it otherwise conducts regular business in this District, and (d) it is causing injury to Plaintiffs in this District.

14.      Venue is proper under 28 U.S.C. §§ 1391(b) and (c) for the same reasons.  In addition, venue is proper because the principal place of Carbon Audio – the inventor of the product being knocked off by Monster – is in this District.  Thus, a substantial part of the events giving rise to the claim occurred in this District, and many of the key documents and witnesses are located here.

PAGE 5 – COMPLAINT

## BACKGROUND

**A.    Carbon Audio and Boomphones – Innovators**

15.    Carbon Audio is a Portland technology start-up success story.  Founded in 2011, the company has made waves in the audio industry in just a few short years with creative wireless speaker products incorporating cutting edge technology.  The company is made up of a group of product design, development and commercialization experts who strive to provide new and creative audio products that are both high quality and low cost.

16.    Although the company is still relatively new, it has already been recognized as a true pioneer in the industry.  As the magazine *Digital Trends* noted in a November 2013 article about the company and the Pocket Speaker:

> Carbon Audio is not what we would call a 'bandwagon company.'  While others crank out off-the-shelf, cookie-cutter products all will-nilly to get in on trending categories like headphones and Bluetooth speakers, Carbon Audio keeps it unique.  The company takes time to step back, figure out how to fill a need, and do it in a way no one else has.[2]

17.    Carbon's very first product, the Zooka® – a Kickstarter[3] funded project – was a remarkable success.  The Zooka®, launched in 2012, looked nothing like previous speakers – it is a small, high quality speaker, wrapped in medical-grade silicon, with a slit running down the middle so that it can easily be attached to a tablet or laptop.[4]

18.    The product was an instant hit, listed in *Rolling Stone* and *Wired* Magazines' 2012 "Gift Guides."[5]  Several media outlets, including the *New York Times*, gave positive reviews.[6]

---

[2]    http://www.digitaltrends.com/wireless-speaker-reviews/carbon-audio-pocket-speaker-review/.

[3]    Kickstarter is a "crowd-funding" platform that allows a large number of people the chance to contribute small or large amounts of money in order to fund a creative project.

[4]    *See* http://shop.carbonaudioinc.com/zooka-Bluetooth-speakers/d/1000; *see also* http://www.carbonaudioinc.com/company/.

[5]     *See* http://www.rollingstone.com/music/pictures/the-2012-gift-guide-20121120/carbon-audio-zooka-0844289; http://www.wired.com/geekdad/2012/12/holiday-gift-guide-5-gadgets/.

[6]     *See* http://gadgetwise.blogs.nytimes.com/2012/09/04/a-speaker-with-a-firm-grip-on-sound/; http://uncrate.com/stuff/zooka-wireless-speaker/.

PAGE 6 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

In addition to online sales, the Zooka® is sold in Apple stores and in "big box" stores such as Target, Wal-Mart and Best Buy.

19.    Plaintiff Boomphones also has a track record of innovation and success in the audio products industry.  Its flagship product, the Phantom, was the first-ever set of headphones that transformed into a "boombox" with just the push of a button.  MTV Geek! called it "simply a great idea" when the product was unveiled at the 2012 Consumer Electronics Show, and the Phantom has steadily gained traction with consumers since its official launch in August 2012.  In September 2013, Boomphones entered into a license agreement with Carbon Audio to become the exclusive licensee for the Pocket Speaker device, and all intellectual property – including patent applications, trade secrets and trade dress – related to that product (the "Pocket Speaker Intellectual Property").

**B.    The Design and Development of the Pocket Speaker**

20.    Following the success of Zooka®, the Carbon team came up with a new idea – another Bluetooth speaker, but one that had the look, feel and size of a smart phone with room-filling, high-quality sound.  The result was the Pocket Speaker.  After conceiving of the idea in approximately September 2012, the Carbon team worked diligently designing and creating the Pocket Speaker.

21.    By October 2012, Carbon had built a working prototype of the Pocket Speaker, and in mid-November, met with representatives of the Apple Store about the product.[7]

22.    On January 3, 2013, Carbon filed an application for a utility patent for the Pocket Speaker, as well as an application for a design patent.  Both of those patent applications are still pending before the U.S. Patent and Trademark Office ("PTO"), although the PTO has indicated that "first office action" will be taken on the design patent application in May 2014.  The Pocket Speaker packaging states "patent pending."

---

[7]    Discussions at the meeting with the Apple Store were covered by a Non-Disclosure Agreement already in place between Carbon Audio and Apple.

PAGE 7 – COMPLAINT

23.    In January of 2013, at the Consumer Electronics Show ("CES") in Las Vegas, Nevada, Carbon Audio met with 3NOD, the Chinese manufacturing company that was already producing Carbon's Zooka®, to discuss fabrication of the Pocket Speaker.[8]

24.    3NOD originally believed that it would be impossible to manufacture such a small speaker with the innovative features Carbon desired, including four "drivers" or speakers – two in the front and two in the back.  Eventually, however, after numerous technical meetings with Carbon's engineers and designers over several months, 3NOD agreed to manufacture the Pocket Speaker with the specifications and details Carbon had envisioned.

25.    3NOD's work on the Pocket Speaker was governed by a Manufacturing Agreement and Non-Disclosure Agreement ("NDA") with Carbon.[9]  Pursuant to these agreements, 3NOD agreed to keep confidential all proprietary information provided by Carbon, including trade secrets.  *See* Mfg. Agreement, Ex. A hereto, at § 9.1; NDA, Ex. B hereto, at p. 1.

26.    By the end of January 2013, 3NOD had manufactured numerous prototypes of the Pocket Speaker, working closely with Carbon's engineers to fine tune the manufacturing process and make the product that was envisioned by Carbon.  Pocket Speaker inventor Jason Riggs lived on-site in China for 3-4 months working with 3NOD to develop the product.  The process included development of (i) "tooling"[10] to make the components, (ii) "firmware"[11] for operation of the Pocket Speaker, (iii) acoustic, electrical and mechanical architecture, and (iv) packaging for the Pocket Speaker.

---

[8]    Carbon had a Non-Disclosure Agreement in place with 3NOD prior to disclosure of any proprietary information.

[9]    The NDA is between 3NOD and a company called "8 LLC."  8 LLC is the predecessor of Carbon Audio.

[10]    Tooling is the process by which a factory develops machinery in preparation for production.  The tooling developed for the Pocket Speaker includes the molds for the insertion of melted plastic that form the device.

[11]    Firmware is the hardware and computer programming instructions stored on read-only memory ("ROM") that instruct a device how to respond to user input.  For example, the firmware in a stereo powers the stereo on when a user pushes the "POWER" button.

PAGE 8 – COMPLAINT

27.     Under the Manufacturing Agreement, all of the information provided to 3NOD (the prototype, the internal configuration, and instructions called the "User Interface" that detail how the product is supposed to work/react when certain functions are performed), as well as the processes that were developed (*supra* para. 26), constitute the intellectual property – and specifically, the trade secrets – of Carbon (the "Pocket Speaker Trade Secrets").  *See* Mfg. Agreement, Ex. A, at §§ 1 ("Created Intellectual Property"), and 10.2.  3NOD was required to keep the Pocket Speaker Trade Secrets confidential and was authorized to use these trade secrets only in connection with manufacturing the Pocket Speaker.  *See* Mfg. Agreement, Ex. A hereto, at § 9.1; NDA, Ex. B hereto, at p. 1.

28.     Carbon Principal Jason Martin created and provided to 3NOD the functional sound files for use in the firmware of the Pocket Speaker.  Carbon is in the process of filing for trademark and copyright protection for these sound effects.

29.     Exactly six of the final prototypes were provided to Carbon in Portland.  Two of the prototypes were kept in a locked cabinet in Carbon's CEO's office, one was provided to Carbon founder Jason Martin, and three were provided to inventor Jason Riggs.  The prototypes provided to Carbon are still in Carbon or its employees' custody or control.

30.     The rest of the prototypes, and the other trade secrets that were provided or developed, remained at the 3NOD factory, subject to the Confidentiality and Non-Disclosure Agreements in place between the parties.

31.     Throughout 2013, Carbon was experiencing financial difficulties.  Payments to 3NOD for manufacture of the Pocket Speaker were behind, and consequently, the Carbon principals began looking for investors to either tide the company over until the Pocket Speaker could reach the market, or to buy the company out-right.

32.     One of the potential suitors for Carbon was SOL Republic, a consumer electronics company founded by Kevin Lee, the son of Noel Lee, founder and CEO of Monster.  Kevin Lee

PAGE 9 – COMPLAINT

worked exclusively at Monster for years before starting SOL Republic and, notwithstanding his position at SOL Republic, he continues to hold a senior executive position – Vice President of Corporate Strategy – at Monster.

33.    In May 2013, Carbon principals met with Kevin Lee and other Sol Republic executives to discuss a potential buyout of Carbon by SOL Republic.  Unfortunately, the two companies could not come to an agreement, and they eventually parted ways.

34.    Thereafter, an executive at SOL Republic informed Jason Martin that Noel Lee of Monster had "the exact same product with a Monster logo on it," and was "shopping it around in Europe."  The executive also advised Mr. Martin to "get his factory in line," which Martin took to mean that the executive believed Noel Lee had obtained the Pocket Speaker prototype from 3NOD, its manufacturer.  When Carbon confronted 3NOD about this conversation, 3NOD denied providing a prototype to anyone.

## C.    The Pocket Speaker Hits The Market In November 2013

35.    Over a year after the concept was developed, the Pocket Speaker was first offered for sale to consumers in November 2013.  The product initially was sold as a Carbon product, but it now is being sold exclusively as a Boomphones product.

36.    The press took note.  *PC Magazine* wrote that the speaker is "an affordable, very portable Bluetooth speaker with clean, bright audio performance," touting its "very cool design element" of being able to pair two speakers to the same device.  *Digital Trends*, noting that Carbon "tends to think outside the box," raved about Pocket Speaker's design and performance, concluding that it "will shock you with its ability to play far louder than its size should allow" and that it "is the most travel-friendly speaker we've evaluated to date."[12]

---

[12]    *See* http://www.pcmag.com/article2/0,2817,2427800,00.asp; http://www.digitaltrends.com/wireless-speaker-reviews/carbon-audio-pocket-speaker-review/. *See also* http://online.wsj.com/news/articles/SB10001424052702303942404579363023967037620.

PAGE 10 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

**D.    The Pocket Speaker's Trade Dress**

37.    The Pocket Speaker's design is different from the devices that preceded it.  No previous speaker was designed to fit into one's pocket like a smart phone.  Even the smaller Bluetooth speakers were typically thicker and much less portable.

38.    But it is not just portability that made the Pocket Speaker stand out.  Its overall design and aesthetic are different from anything on the market.  While previous Bluetooth speakers were larger, thicker and more "blocky," the overall design of the Pocket Speaker is a thin, rectangular-shaped product, with four evenly rounded corners:



39.    As the above schematics show, individual, distinctive features of the Pocket Speaker include:

- A distinctive, perforated grille on both the front and back of the product.

- Two opposable circular passive radiators in the middle of the device that vibrate with the bass of the music and convey the message "loud."

- A removable silicon band – that comes in different colors and that wraps around the product.

- Slightly raised, intuitive and easy to use buttons on top – for Bluetooth connectivity, pairing, volume and power.

- Distinctive and innovative sounds, including for "on" "full battery" "searching" and "connected."

- Two LED light indicators for power, charging and connectivity and one

PAGE 11 – COMPLAINT

microphone opening.

- A power outlet located on the side, covered by a removable flap of the silicon wrapping.

40.     The overall design of the Pocket Speaker, the individual design elements, and the combination of both, are distinctive and serve to identify Plaintiff as the source of the Pocket Speaker (the "Pocket Speaker Trade Dress").  These trade dress rights, along with the goodwill associated with Plaintiffs' names, are Plaintiffs' valuable assets.

41.     The trade dress of the Pocket Speaker is not merely functional, as competitors have many options from which they can choose their own product designs.

42.     Since the Pocket Speaker debuted in November 2013, the product has been available both online and in Apple stores, and is being distributed by 17 different distributors in 15 countries.  Plaintiffs also have engaged in significant marketing efforts for the Pocket Speaker, including an extensive marketing campaign at the January 2014 Consumer Electronics Show (CES) in Las Vegas and a creative social media presence.[13]

**E.      CES 2014:  Monster Unveils A Knock-Off**

43.     CES is the most important trade show in the consumer electronics industry.  Held every year in Las Vegas in January, technology companies unveil their latest technology gadgets at CES, often with considerable fanfare.  CES is a marketplace where large and small companies, innovators, and manufacturers come together to exhibit consumer electronics.

44.     CES 2014 was held between January 7-10, 2014.  For the event, Boomphones purchased nearly $150,000 worth of advertising featuring the Pocket Speaker, including taxi cab toppers and billboard signage at the Las Vegas Convention Center – ads calculated to have over 1 million impressions over the course of the trade show.

---

[13]      *See, e.g.,* *http://www.youtube.com/watch?v=hqiaGztPWlw*; *http://www.youtube.com/watch?v=mtNeKAbm1H4.*

PAGE 12 – COMPLAINT

45.     The largest companies typically have the largest booths in the best locations at CES.  Monster is widely considered a significant player in consumer electronics.  Although its history has been in cables – it touts itself as the "world's leading manufacturer of high performance cables"[14] – Monster more recently has entered into the portable speaker market.

46.     At CES 2014, Monster had a prime location immediately off of the grand lobby of the Las Vegas Convention Center, complete with a Lamborghini, celebrities and models.  Not coincidentally, SOL Republic was also at CES, sharing a hospitality suite with Monster.

47.     Monster unveiled the "Superstar" at this year's CES, tapping former Los Angeles Laker, Shaquille O'Neal to promote it with the slogan, "Size Does Matter":



48.     Monster stated at CES that the Superstar would be available to the public in "late March" 2014, although a distributor has stated that it will be available on March 14, 2014.[15]

49.     After the Boomphones team was alerted at CES that Monster was showcasing a very similar product, Boomphones representatives went to the Monster booth to investigate, only to find essentially the same product being touted as "Monster innovation."  One of the Boomphones employees videotaped the Monster product at the show and the team discovered

---

[14]     *See* http://www.monsterproducts.com/company_info/monster_cable_products.asp.
[15]     *See* http://www.youtube.com/watch?v=N8h2KoIIWo8 ("late March");
http://hu.horn.eu/en/HU/PRODUCTS/BLUETOOTH/SPEAKERS/?s1=1 (March 14).

PAGE 13 – COMPLAINT

that the similarities were not simply visual – the Monster Superstar's function tones were the **exact same** as the Pocket Speaker's distinctive and proprietary tones. This is confirmed by sound wave comparisons between the Pocket Speaker's tones and Monster's tones:[16]



50.    During this interaction at Monster's booth, the Boomphones representatives told the Monster representative that they were also affiliated with Carbon Audio. The Monster representative said in reply "Oh then you know the whole story with this product. Don't worry there is plenty of pie for us to share."

---

[16]    The slight differences in the soundwave images are likely due to the fact that the Monster tones were taken from a video camera at CES, where there were background noises. The Pocket Speaker tones were taken from audio files with no background noise.

PAGE 14 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

51.    As the photos below (and above) make clear, the Superstar is a blatant copy of the

Pocket Speaker:

**PLAINTIFFS' PRODUCT**                    **DEFENDANT'S PRODUCT**

52.    Specifically:

- The overall shape – a thin rectangular product with four evenly rounded corners –

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

is the same, and the overall dimensions appear to be identical as well.

- The Superstar is likewise wrapped in a silicon-type product.

- The Superstar likewise has a perforated grille.

- The Superstar likewise has circular passive radiators in the center of the front and back that appear to have the same dimensions as the Pocket Speaker's circular passive radiators, giving it the same overall look.

- The Superstar likewise has slightly raised buttons on the top of the device – also for "power," "volume," and "pairing" – with the exact same symbols.

- The Superstar likewise has two LED light indicators for power, charging and connectivity and one microphone opening – all in the exact same locations.

- The Superstar's power/charging inlet is in the exact same location as the Pocket Speaker's and uses the exact same symbol.

53.    Monster's Albert Lee, who describes himself as lead product developer at Monster, showed off the Superstar in a promotional video filmed at CES.  Part of his pitch was that the speaker "fits in your pocket," even demonstrating this feature in the video.[17]  Mr. Lee stated at CES that the Superstar was different from previous speakers because it was "flat," which diverged from the "bulbous, round, big, blocky" speakers that were already on the market.[18]  This statement would have been accurate if Mr. Lee was describing the Pocket Speaker.  Notably, many of Monster's previous speakers were, in fact, "bulbous, round, big and blocky," making the Superstar a distinct departure from Monster's previous products:

---

[17]    *See* http://www.youtube.com/watch?v=N8h2KoIIWo8; *see also* http://www.monsterproducts.com/speakers/superstar/ ("Designed to fit in your pocket.").
[18]    *See* http://www.youtube.com/watch?v=N8h2KoIIWo8.

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

### MONSTER'S PREVIOUS SPEAKERS

  

**F.     Monster Uses The Same Chinese Manufacturer And Has Misappropriated Plaintiffs' Trade Secrets**

54.     3NOD was also at CES.  After first confronting Monster about its knock-off product, representatives of Boomphones met with a representative of 3NOD in 3NOD's hospitality suite.  During this meeting, the representative of 3NOD acknowledged two critical points:  (i) it was manufacturing the Superstar for Monster (necessarily using Plaintiffs' trade secrets), and (ii) it had given a prototype of the device to SOL Republic prior to the time the Pocket Speaker was on the market.

55.     Notably, although SOL Republic is ostensibly a competitor of Monster, it has been called a "spin off" of Monster,[19] given that (i) it was founded by Kevin Lee, a longtime Monster executive and the son of Monster founder and CEO Noel Lee, and (ii) SOL Republic has been described as selling Monster-like products but at cheaper prices.[20]

56.     Even though he formed SOL Republic, Kevin Lee continues to hold a senior executive position – Vice President of Corporate Development – at Monster.  Kevin Lee has also made clear that his loyalties very much remain with Monster and his father:

Q:  How would you feel about possibly running your father's empire in the near future?

---

[19]     *See* http://www.digitaltrends.com/home/sol-republic-spins-off-from-monster-cable-with-four-new-headphones/.

[20]     *Id.*

PAGE 17 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

A:  Kevin [Lee]: One, I'd be honored. **Cut me open, I'm a monster and will always be a monster.** Doing that and being apart of the ongoing future of Monster, also running the company as good as he [Noel Lee] did, or even better, I would want to make him even prouder. …[21]

57.    On information and belief, Monster obtained a prototype of the Pocket Speaker – from SOL Republic and/or 3NOD – prior to its launch and then contracted with 3NOD to make a knock off product.

58.    Monster was aware – or should have been aware – that the Pocket Speaker incorporated the Pocket Speaker Trade Secrets, that 3NOD was obligated not to disclose those trade secrets to anyone, and that those same trade secrets would be used in connection with the manufacture of the Superstar.

**G.    Monster's Marketing Is False**

59.    Monster is making a number of false statements about the Superstar in its marketing.  In the same promotional video referenced *supra*, Monster's Albert Lee states:

- "Our latest new offering here at CES 2014 is the Monster Superstar, a brand new micro-Bluetooth speaker, a new breed of speaker…."

- "With this we actually stuck three drivers, a huge radiator in the middle, we are able to achieve a lot of SPL, a lot of great volume for people who respect that…."

- "We've spent a lot of time with our acoustic engineers to make sure this sounds every bit as big as people expect…."[22]

60.    Monster's press release on the Superstar states:

- "Monster has challenged the limits in creating a Bluetooth speaker with the smallest form factor design…"

---

[21]    *See* http://www.complexmag.ca/tech/2011/12/interview-monster-cable-noel-lee-sol-republic-kevin-lee .

[22]    *Id.*

PAGE 18 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

- "…Monster® has incorporated Pure Monster Sound™ into every aspect of this design" and "…the Monster® SuperStar has also been engineered with Pure Monster Sound™, the high-performance tuning concept created by Head Monster Noel Lee…"

- "[Superstar] … [t]echnology … is … tempered with Monster innovation."[23]

61.     As long lines at Apple stores reflect whenever the company introduces a new product, these kinds of statements are important to consumers, who value associating themselves with "innovative" companies and products.  But Monster's statements are false.  It is not the "creator," "designer" or "engineer" of this speaker.  Nor does the Superstar reflect any Monster "innovation."  Rather than innovate, Monster chose the easy route – it wrongfully copied Plaintiffs' innovation.

**H.     The Superstar is Creating Confusion in the Marketplace**

62.     A number of attendees at CES noted to Boomphones representatives the marked similarities between the products and expressed confusion over the source of the products.

63.     Consumers are likewise expressing confusion on social media.  For example, in response to Monster's CES promotional video, one commentator on Youtube stated: "Umm dont they sell some similar to these in the apple stores?  Carbon Audio Portable Speakers."[24]  On Monster's Instagram page featuring the Superstar, one commentator also noted that the Superstar was not original: "Boomphones did it first!!!"[25]

**COUNT I**
**Trade Dress Infringement**
**(Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))**

64.     Plaintiffs reallege and incorporate herein the preceding paragraphs 1-63 of this Complaint.

---

[23]     *See* Ex. C hereto.  Plaintiffs do not recognize the posters who made these comments.
[24]     http://www.youtube.com/watch?v=N8h2KoIIWo8.
[25]     http://instagram.com/p/jADfKVhUit/#.

PAGE 19 – COMPLAINT

K&L GATES LLP
ONE SW COLUMBIA STREET
SUITE 1900
PORTLAND, OR  97258
TELEPHONE: (503) 228-3200

65.     Carbon Audio is the owner, and Boomphones is the exclusive licensee, of the Pocket Speaker Trade Dress, and Plaintiffs owned these rights prior to acts of Monster complained of herein.

66.     As a result of the Pocket Speaker's distinctive design and Plaintiffs' promotion and sales of the product, the Pocket Speaker Trade Dress has acquired secondary meaning. Relevant consumers now identify Plaintiffs as the source of the Pocket Speaker.

67.     Monster's direct copying of the Pocket Speaker further establishes that the Pocket Speaker Trade Dress has acquired secondary meaning.

68.     The features that comprise the Pocket Speaker Trade Dress, and the combination of those features, are non-functional.

69.     Defendant's conduct with respect to its Superstar product is causing, and is likely to continue to cause, confusion, mistake or deception as to the affiliation, connection or association of Monster with Plaintiffs, or as to the origin, sponsorship, or approval by Plaintiffs, of Monster's goods, services or commercial activities.

70.     Defendant's conduct further enables Monster to benefit unfairly from Plaintiffs' reputation and success, thereby giving Monster commercial value it would not otherwise have.

71.     Defendant's conduct has further diminished, and will continue to diminish, Plaintiffs of the ability to control the consumer perception of the Pocket Speaker, placing the valuable reputation and goodwill of Plaintiffs in the hands of Monster, over whom it has no control.

72.     These acts constitute unfair competition and trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73.     As a result of this conduct, Plaintiffs have suffered damages and irreparable harm. Unless the Court enjoins Defendant's conduct under 15 U.S.C. § 1116 or as otherwise provided by law, Plaintiffs will continue to suffer irreparable harm.

PAGE 20 – COMPLAINT

74.    Defendant's knowledge of Plaintiffs' trade dress rights, its reckless disregard for the likely confusion caused by its acts, and its other wilful and wanton conduct described herein renders this case exceptional under 15 U.S.C. § 1117(a), entitling Plaintiffs to Monster's profits, treble damages, an award of costs and reasonable attorneys' fees.

## COUNT II
### Misrepresentation
### (Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))

75.    Plaintiffs reallege and incorporate herein the preceding paragraphs 1-74 of this Complaint.

76.    Defendant's marketing for the Superstar is misleading in that it misrepresents, *inter alia*, the nature and origin of its product.  Among other things, Monster represents that it was the "creator" of this genre of speaker and that the Superstar reflects Monster's "innovation." These claims are demonstrably false.

77.    Defendant's conduct violates Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which prohibits any statements in "commercial advertising or promotion [that] misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

78.    As a result of this conduct, Plaintiffs have suffered damages and irreparable harm. Unless the Court enjoins Defendant's conduct under 15 U.S.C. § 1116 or as otherwise provided by law, Plaintiffs will continue to suffer irreparable harm.

## COUNT III
### Misappropriation of Trade Secrets
### (Oregon Uniform Trade Secrets Act, ORS 646.461 *et seq.*)

79.    Plaintiffs reallege and incorporate herein the preceding paragraphs 1-78 of this Complaint.

80.    Carbon Audio is the owner, and Boomphones is the exclusive licensee, of the Pocket Speaker Intellectual Property, including the Pocket Speaker Trade Secrets.

PAGE 21 – COMPLAINT

81.     The Pocket Speaker Trade Secrets were provided by Carbon Audio to 3NOD and/or they were developed by the parties under contractual agreements of non-disclosure and confidentiality.

82.     The Manufacturing Agreement defines "Created Intellectual Property," *inter alia,* to include "discoveries, inventions, technical information, procedures, manufacturing processes, software, firmware, technology, know-how or other intellectual property rights created, developed or reduced to practice in (i) preparing any product provided pursuant to this Agreement, or (ii) which is otherwise embodied within the Manufacturing Services or any other work provided pursuant to this Agreement."  Ex. A § 1.

83.     Under section 10.2 of the Manufacturing Agreement, Carbon Audio retains "all right, title, and ownership to any Created Intellectual Property."  Ex. A § 10.2.

84.     The Manufacturing Agreement defines "Proprietary Information," *inter alia,* to include "software," "firmware," "plans," "trade secrets," "patent rights," "inventions," "operating procedures," "processes," and "methods."  Ex. A § 1.

85.     Under section 9 of the Manufacturing Agreement, 3NOD was to use "the same degree of care, but no less than a reasonable degree of care" to protect the Proprietary Information of Carbon, and to ensure that disclosure of any Proprietary Information to its Representatives was on a "need-to-know" basis only to those who have been informed of and have agreed to be bound by the confidentiality provisions of the Manufacturing Agreement.  Ex. A § 1.

86.     The NDA defines "Information," *inter alia,* to include "any and all information provided" by Carbon Audio to 3NOD, including "product features, functionality, operation and results, product development techniques and plans, technical processes, designs and design projects, inventions and research programs, trade 'know-how,' trade secrets, specific software."  Ex. B p. 1.

PAGE 22 – COMPLAINT

87.    The NDA prohibits 3NOD from disclosing the Information to any third party and requires that 3NOD may only use the Information in connection with the relationship between Carbon Audio and 3NOD.  Ex. B p. 1.

88.    The Pocket Speaker Trade Secrets were provided to 3NOD for the sole purpose of manufacturing the Pocket Speaker and for no other reason.

89.    Plaintiffs maintained the secrecy of the Pocket Speaker Trade Secrets via non-disclosure, confidentiality agreements and other means.

90.    On information and belief, Monster obtained a prototype of the Pocket Speaker from or through 3NOD, prior to the launch of the Pocket Speaker.

91.    Monster knew or should have known that 3NOD's relationship with Carbon was governed by a confidentiality and/or non-disclosure agreement.

92.    Monster knew or should have known that its acquisition of the prototype of the Pocket Speaker from or through 3NOD was in violation of 3NOD's confidentiality obligations and the Oregon Uniform Trade Secrets Act.

93.    Monster knew that the firmware, tooling/moldings, acoustic design and architecture, manufacturing processes and other confidential information used to produce the Superstar were not created by Monster.  Monster knew or should have known the fact that these were and are trade secrets of Plaintiffs and that utilization of these trade secrets was in violation of 3NOD's confidentiality obligations and the Oregon Uniform Trade Secrets Act.

94.    While the concept and general design of the Pocket Speaker became public upon its launch in November 2013, the internal specifications, acoustic architecture, firmware, tooling and manufacturing processes remain trade secrets under the Oregon Uniform Trade Secrets Act. Through its actions, Monster continues to misappropriate those trade secrets.

95.    The pending utility patent application for the Pocket Speaker also remains a trade secret under the Oregon Trade Secrets Act until it is published.

PAGE 23 – COMPLAINT

96.      Plaintiffs' confidential trade secret information acquired by Monster gave Monster an unfair advantage in the marketplace.

97.      ORS 646.463 provides that "[a]ctual or threatened misappropriation may be temporarily, preliminarily, or permanently enjoined."

98.      As a result of this conduct, Plaintiffs have suffered damages and irreparable harm. Unless the Court enjoins Defendant's conduct under ORS 646.463 or as otherwise provided by law, Plaintiffs will continue to suffer irreparable harm.

99.      ORS 646.465 provides for money damages for misappropriation of trade secrets, including punitive damages up to twice the amount of actual damages upon a finding of willful or malicious misappropriation.

100.     ORS 646.467 provides for attorneys' fees when misappropriation is found to be willful or malicious by the Court or a jury.

101.     Monster's actions in misappropriating Plaintiffs' trade secrets were willful and malicious, entitling Plaintiffs to punitive damages and attorneys' fees.

## COUNT IV

### Tortious Interference with Contractual Relations

102.     Plaintiffs reallege and incorporate herein the preceding paragraphs 1-101 of this Complaint.

103.     The Manufacturing Agreement (Ex. A) was entered into by Carbon Audio and 3NOD.

104.     The Manufacturing Agreement remains in effect until terminated by one of the parties in writing for convenience, (Ex. A, § 8.1) for uncured breach (*id.* § 8.2), or for insolvency (*Id.* § 8.3.)

105.     The Manufacturing Agreement has not been terminated by either party under the provisions of Section 8.

PAGE 24 – COMPLAINT

106.   The NDA (Ex. B) was entered into by 8 LLC, Carbon Audio's predecessor, and 3NOD.

107.   The NDA was effective December 8, 2011, and remains in effect.  Ex. B, p. 2.

108.   Both the Manufacturing Agreement and NDA required 3NOD to keep confidential the Pocket Speaker Trade Secrets and to use those trade secrets only for purposes of manufacturing the Pocket Speaker.

109.   Monster acquired the Pocket Speaker Trade Secrets from or through 3NOD in breach of 3NOD's contractual duties of confidentiality and non-disclosure under these two agreements.

110.   Monster is not a party to the Manufacturing Agreement or the NDA between Carbon Audio and 3NOD.

111.   Monster knew or should have known of the existence of the Manufacturing Agreement and/or NDA between Carbon Audio and 3NOD, and knew or should have known that its conduct was inducing 3NOD to breach its contracts with Carbon Audio.

112.   Monster induced 3NOD to breach its Agreements with Carbon Audio in order to acquire the Pocket Speaker Trade Secrets, for the improper purpose of using the Pocket Speaker Trade Secrets to create a knock-off of the Pocket Speaker, knowingly in violation of law and established standards of confidentiality in the consumer electronics trade.

113.   As a result of Monster's improper acquisition of the Pocket Speaker Trade Secrets, Monster was able to develop, manufacture, and get the Superstar to market months faster and at significantly cheaper cost than it would have without misappropriation of the Pocket Speaker Trade Secrets.

114.   Also as a result of Monster's improper acquisition of the Pocket Speaker Trade Secrets, Monster used its considerable capital and market presence at CES and otherwise to create the impression that Monster had created the Pocket Speaker, and that the Boomphones

PAGE 25 – COMPLAINT

version was a knock-off of the Superstar.

115.    As a result of this conduct, Plaintiffs have suffered damages and irreparable harm. Unless the Court enjoins Defendant's conduct, Plaintiff will continue to suffer irreparable harm.

**COUNT V**
**Tortious Interference with Prospective Economic Advantage**

116.    Plaintiff realleges and incorporates herein the preceding paragraphs 1-115 of this Complaint.

117.    The Pocket Speaker Trade Secrets were developed over the course of more than a year and with the expenditure of over a million dollars.

118.    The Pocket Speaker is a unique product, which has received positive press and user reviews.

119.    Plaintiffs had an economic advantage of being first to market with a product like the Pocket Speaker.

120.    Through its wrongful conduct, Monster was able to introduce a knock-off product to the market months earlier, and at a much cheaper cost, than if Monster had legitimately designed and developed such a product on its own.  This wrongful "head start" has significantly reduced the amount of time that Plaintiffs should have enjoyed being the exclusive seller of such a device.

121.    Monster's conduct was knowingly in violation of law and established standards of confidentiality in the consumer electronics trade.

122.    As a result of this conduct, Plaintiffs have suffered damages and irreparable harm. Unless the Court enjoins Defendant's conduct, Plaintiff will continue to suffer irreparable harm.

PAGE 26 – COMPLAINT

## COUNT VI

### State Unlawful Trade Practices
### (ORS 646.605 – 646.656)

123.   Plaintiffs reallege and incorporate herein the preceding paragraphs 1-122 of this Complaint.

124.   The conduct alleged herein constitutes a violation of the Oregon Unlawful Trade Practices Act in that such conduct:

(a)   Causes likelihood of confusion, mistake or deception as to the affiliation, connection or association of Monster with Plaintiffs, or as to the origin, sponsorship, or approval by Plaintiffs, of Monster's goods, services or commercial activities.  ORS 646.608(1)(b).

(b)   Uses deceptive representations in connection with the promotion of the Monster Superstar.  ORS 646.608(1)(d).

(c)   Represents that the Monster Superstar has characteristics, benefits, or qualities it does not have.  ORS 646.608(1)(e).

125.   As a result of Defendant's conduct – which was willful – Plaintiffs have suffered damages and irreparable harm.  Unless the Court enjoins Defendant's conduct under ORS 646.638 or as otherwise provided by law, Plaintiffs will continue to suffer irreparable harm.

### COUNT VII

### Civil Conspiracy

126.   Plaintiffs reallege and incorporate herein the preceding paragraphs 1-125 of this Complaint.

127.   Defendant and non-party 3NOD conspired for an unlawful purpose, namely, to improperly use Plaintiffs' trade secrets and/or confidential information – which 3NOD was required to keep confidential – to produce a knock off product.

128.   The purpose of this conspiracy was to cause injury to Plaintiffs.

PAGE 27 – COMPLAINT

129.    As a result of Defendant's conduct – which was wilful – Plaintiffs have suffered damages and irreparable harm.  Unless the Court enjoins Defendant's conduct, Plaintiffs will continue to suffer irreparable harm.

## COUNT VIII

### Common Law Conversion

130.    Plaintiffs reallege and incorporate herein the preceding paragraphs 1-129 of this Complaint.

131.    Carbon Audio owns, and Boomphones is the exclusive licensee of, the confidential information related to the Pocket Speaker, including the prototypes of the device, molds/tooling, firmware and manufacturing processes.

132.    Defendant has wrongfully misappropriated and converted to its own use this confidential and proprietary information.

133.    As a result of Defendant's conduct, Plaintiffs have suffered damages and irreparable harm.  Unless the Court enjoins Defendant's conduct, Plaintiffs will continue to suffer irreparable harm.

## COUNT IX

### Unjust Enrichment

134.    Plaintiffs reallege and incorporate herein the preceding paragraphs 1-133 of this Complaint.

135.    Monster received the benefit of the significant time and effort expended to create and develop the Pocket Speaker Trade Secrets.

136.    Monster knows that it did not develop the trade secrets necessary to create, develop, and get the Superstar to market.

137.    It would be unjust to allow Monster to retain these benefits.

PAGE 28 – COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.      A declaration and/or judgment from this Court that:

    (a)      Monster has infringed the Pocket Speaker Trade Dress in violation of 15 U.S.C. § 1125(a)(1)(A);

    (b)      Monster has engaged in unfair business practices/false advertising/misrepresentations in violation of 15 U.S.C. § 1125(a)(1)(B);

    (c)      The Pocket Speaker Trade Secrets meet the definition of "trade secret" under the Oregon Unfair Trade Practices Act, ORS 646.461 *et seq.*, and that Monster has misappropriated same in violation of that statute;

    (d)      Monster has tortiously interfered with Carbon Audio's contractual relations;

    (e)      Monster has tortiously interfered with Plaintiffs' prospective economic advantage;

    (f)      Monster has engaged in a civil conspiracy to Plaintiffs' detriment;

    (g)      Monster has converted Plaintiffs' property to its own use

    (h)      Monster has been unjustly enriched; and

    (i)      Monster's conduct was intentional, willful and/or malicious;

2.      An order and judgment temporarily, preliminarily and permanently enjoining Monster and its officers, directors, agents, servants, employees, affiliates, attorneys, parents,

PAGE 29 – COMPLAINT

subsidiaries, divisions, successors and assigns, and all others acting in privity or in concert or participation with them, who shall receive proper notice, from showing, selling, marketing, distributing, discussing, or displaying the Superstar product or any product that is the same or similar to the Pocket Speaker, or those derived from or based on the Pocket Speaker;

3.      An order and judgment requiring Defendant to deliver to Plaintiffs for destruction all Superstar devices or any product that is the same or similar to the Pocket Speaker, or those derived from or based on the Pocket Speaker, and all plates, molds, tooling or other means of making the same; and that Defendant be required to recall all such products that it has delivered, shipped or otherwise provided to any distributors, customers, or third parties, and refund any monies paid for such products;

4.      Actual damages suffered by Plaintiffs as a result of Monster's unlawful conduct, in an amount to be proven at trial, including without limitation lost profits and costs for corrective advertising, as well as pre-judgment and post-judgment interest at the maximum rate authorized by law;

5.      Treble damages pursuant to 15 U.S.C. § 1117;

6.      Punitive damages pursuant to ORS 646.465, ORS 646.638, or as otherwise provided by law;

7.      Costs of the suit and reasonable attorneys' fees pursuant to ORS 646.467, 15 U.S.C. § 1117 or as otherwise provided by law;

8.      Restitutionary relief against Monster and in favor of Plaintiffs, including disgorgement of wrongfully obtained profits and any other appropriate relief; and

PAGE 30 – COMPLAINT

9.    Any other remedy relief as this Court deems just and proper.

DATED:  February 26, 2014.

K&L GATES LLP


By   /s/ B. John Casey
        B. John Casey, OSB #86365
        Stephanie McCleery, OSB #98146
        Michael J. Abernathy (*pro hac vice pending*)

        *Attorneys for Plaintiffs*

PAGE 31 – COMPLAINT